JUNEAU COUNTY STAR-TIMES and George Althoff,
Plaintiffs-Appellants,

v.

JUNEAU COUNTY and Kathleen Kobylski,
Defendants-Respondents-Petitioners.†

Supreme Court

*No. 2010AP2313. Oral argument September 5, 2012.
—Decided January 8, 2013.*

2013 WI 4

(Also reported in 824 N.W.2d 457.)

† Motion for Reconsideration denied March 5, 2013.

123

For the defendants-respondents-petitioners, there were briefs filed by *Joseph P. Wright, Bryan Kleinmaier,* and *Richard K. Nordeng* and *Stafford Rosenbaum, LLP,* Madison, and oral argument by *Bryan Kleinmaier.*

For the plaintiffs-appellants, there was a brief filed by *Christa Westerberg* and *Pamela R. McGillivray,* and *McGillivray, Westerberg & Bender, LLC,* Madison, and oral argument by *Christa Westerberg.*

An amicus curiae brief was filed by *April Rockstead Barker* and *Schott, Bublitz & Engel, S.C.,* Brookfield, on behalf of the Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, and the Wisconsin Broadcasters Association.

An amicus curiae brief was filed on behalf of the Wisconsin Department of Justice by *Mary E. Burke,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Andrew T. Phillips* and *Patrick C. Henneger,* and *Phillips Borowski, S.C.,* Mequon, on behalf of the Wisconsin Counties Association.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J.   This case calls upon the court to interpret once again the Wisconsin Public Records Law.[1] The duties of government authorities under the Public Records Law are of substantial and continuing interest.

¶ 2.   We are reviewing a published decision of the court of appeals that reversed a judgment of the Circuit Court for Juneau County, Charles A. Pollex, Judge.[2] The circuit court dismissed the complaint of the Juneau County Star-Times and George Althoff (collectively, the Star-Times) seeking relief pursuant to the Public Records Law against Juneau County and Kathleen Kobylski (collectively, the County).[3] The court of appeals reversed the judgment of the circuit court. We affirm the decision of the court of appeals.

¶ 3.   The genesis of the present case is litigation against the County relating to an employee of the Juneau County Sheriff's Department. The County's

---

[1] For purposes of this opinion, we refer to Wis. Stat. §§ 19.31–.39 (2009–10) as the Public Records Law, although these provisions are sometimes referred to as the "Open Records Law." Retention and preservation of documents, addressed at Wis. Stat. §§ 16.61–.62, and also sometimes referred to as the "Public Records Law," is not involved in the instant case.

All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

[2] *Juneau County Star-Times v. Juneau County,* 2011 WI App 150, 337 Wis. 2d 710, 807 N.W.2d 655.

[3] George Althoff is the publisher of the Juneau County Star-Times. Kathleen Kobylski is the Juneau County Clerk.

defense was conducted by the Crivello Carlson law firm (the law firm), which was retained to represent the County by the County's insurance company, Wisconsin County Mutual Insurance Corporation (the insurance company).

¶ 4.  The County and the insurance company are parties to a contract, namely the Public Entity Liability Policy (the liability insurance policy), which the County procured from the insurance company. The liability insurance policy provides that the insurance company shall defend the County for covered occurrences; shall pay sums that the County becomes legally obligated to pay as damages as a result of a covered occurrence; and shall also pay attorney fees and related costs in defending against a claim.[4] The liability insurance policy also provides that the County shall cooperate with the insurance company (and therefore with counsel retained by the insurance company) in preparing the County's defense.

---

[4] The liability insurance policy provides, in relevant part:

*We* [County Mutual] have the right and duty to defend any *suit* against the *insured* seeking monetary damages on account of *bodily injury, personal injury, property damage* or *errors and omissions* or any combination thereof, but:

1. The amount *we* will pay for damages is limited as described in Section IV – Limits of Insurance;

2. *We* may, at *our* discretion, investigate any *occurrence* and settle any claim or *suit* that may result even if the settlement amount is exclusively within the *insured's* deductible, and

3. Our right and duty to defend end when *we* have used up the Limit of Insurance in the payment of judgments or settlements under Coverages A, B or C. This applies to both claims and *suits* pending at that time and those filed thereafter.

*Defense costs* are payable in addition to the policy limit after any applicable deductible has been exhausted.

(Emphasis in original.)

¶ 5.   Pursuant to the liability insurance policy, the insurance company retained the law firm to represent the County. The County accepted the law firm's representation pursuant to the liability insurance policy and worked with the law firm in preparing the County's defense. Thus, an attorney-client relationship was created between the law firm and the County pursuant to the liability insurance policy. Representatives of the County, including corporation counsel, consulted directly with the law firm with regard to the litigation.

¶ 6.   The law firm prepared and sent to the insurance company invoices (itemized bills) for its legal services rendered pursuant to the liability insurance policy in the defense of the County. Relying on the Public Records Law, the Star-Times sought access to these invoices.

¶ 7.   The parties dispute whether the invoices generated by the law firm fall within Wis. Stat. § 19.36(3) of the Public Records Law, the "contractors' records" provision. Section 19.36(3) requires an authority (as defined in the Public Records Law) to "make available for inspection and copying . . . any record produced or collected under a contract entered into by the authority . . . to the same extent as if the record were maintained by the authority."[5]

¶ 8.   The circuit court concluded that Wis. Stat. § 19.36(3) does not apply to the invoices because the County had not contracted with the insurance company "for purposes of collecting and maintaining the infor-

---

[5] Wisconsin Stat. § 19.36(3) reads in full as follows:

Contractors' records. Subject to sub. (12), each authority shall make available for inspection and copying under s. 19.35(1) any record produced or collected under a contract entered into by the authority with a person other than an authority to the same extent as if the record were maintained by the authority. This subsection does not apply to the inspection or copying of a record under s. 19.35(1)(am).

mation" that the Star-Times was seeking. According to the circuit court, the invoices were produced by the law firm for the insurance company under the insurance company's agreement with the law firm, not under the insurance company's liability insurance policy with the County. The circuit court further concluded that even if § 19.36(3) applied, the invoices were properly redacted to protect the attorney-client privilege.[6]

¶ 9.   The court of appeals reversed the judgment of the circuit court and remanded the matter to the circuit court, ordering the County to make available unredacted copies of the invoices to the Star-Times. The court of appeals concluded:   (1) Wis. Stat. § 19.36(3) applies to the invoices as records collected by the insurance company under its liability insurance policy with the County; and (2) the County failed to point to evidence sufficient to survive summary judgment on the question whether its redactions qualify as privileged attorney-client information.[7]

---

[6] The circuit court reasoned:

1. The legal invoices are not records under Wis. Stat. § 19.32(2) because they were neither created by nor kept by the County.

2. The legal invoices are not contractors' records under Wis. Stat. § 19.36(3) because the invoices were generated under an apparent agreement or contract between the County's insurer and the Crivello Carlson law firm, to which the County was not a party.

3. The County did not waive its right to argue that the legal invoices were not records or contractors' records by failing to assert that in its initial response to the Star-Times request.

4. Even if the invoices were subject to a Public Records request, the invoices do contain detailed descriptions of the nature of the legal services rendered to Juneau County and are protected by attorney-client privilege.

[7] *Star-Times,* 337 Wis. 2d 710, ¶ 2.

¶ 10.  We affirm the decision of the court of appeals. We use somewhat different reasoning, however. We too conclude that the invoices are contractors' records under Wis. Stat. § 19.36(3).[8] Our decision is based on the tripartite relationship of the County, the insurance company and the law firm, all arising from the liability insurance policy.

¶ 11.  The tripartite relationship arising from the liability insurance policy is as follows:

(1) The liability insurance policy is the basis of a contractual relationship between the County and the insurance company:  The insurance company agrees in the liability insurance policy to pay damages the County owes and to pay attorney fees incurred for the County's defense.

(2) The liability insurance policy is the basis of a contractual relationship between the insurance company and the law firm:  The insurance company retains the law firm, pursuant to the liability insurance policy, to represent the County and agrees to pay the attorney fees. The law firm that accepts the assignment undertakes the County's representation in accordance with the liability insurance policy.

(3) The liability insurance policy is the basis of a contractual relationship between the law firm and the County:  Pursuant to the liability insurance policy, the law firm retained by the insurance company enters into a contractual attorney-client (agency) relationship with the County.

---

[8] In light of our holding, we need not and do not address whether the invoices should be viewed as records under Wis. Stat. § 19.32(2) and whether the County has waived its argument that the invoices are not records.

¶ 12.  The liability insurance policy thus is the basis for contractual relationships between the County and the insurance company, as well as between the insurance company and the law firm, and the law firm and the County.

¶ 13.  The invoices—the billings for the law firm's legal work performed as the County's defense counsel and the insurance company's retained counsel—were produced or collected in the course of the law firm's representation of the County and the insurance company under the liability insurance policy between the County and the insurance company. Because the liability insurance policy is the basis for the tripartite relationship between the County, the insurance company, and the law firm, and is the basis for an attorney-client relationship between the law firm and the County, we conclude that the invoices were produced or collected during the course of the law firm's representation of the County and the insurance company pursuant to the liability insurance policy; the liability insurance policy is a contract entered into by the County and the insurance company. Thus, the requirements of Wis. Stat. § 19.36(3) have been met and § 19.36(3) governs the accessibility of the invoices.

¶ 14.  We do not address the question whether the circuit court's approved redactions of the invoices were proper. This issue is not before the court. The County did not seek review of the issue of redaction, explaining in its petition for review that it sought review only of the issue whether the invoices are subject to the Public Records Law.[9] The Order of this court accepting review in the instant case provided that the County "may not raise or argue issues not set forth in the petition for

---

[9] County's Petition for Review at 10.

review unless otherwise ordered by the court." The County repeated its position at oral argument that the invoices in question did not contain any confidential work product or attorney-client privileged information that had to be redacted.

¶ 15. The propriety of the redaction was not briefed or argued in this court. Our ruling in the present case does not alter the rules governing confidentiality, attorney-client privilege, or lawyers' work product, or any other rules protecting against disclosure. No issue has been raised with regard to these rules. We therefore do not decide which court—the circuit court or the court of appeals—reached the correct result regarding redaction of the invoices.

¶ 16. Accordingly, we affirm the decision of the court of appeals remanding the matter to the circuit court to order the County to provide unredacted copies of the invoices to the Star-Times.

I

¶ 17. The facts of this case are undisputed. The County procured a Public Entity Liability Policy (the liability insurance policy) from Wisconsin County Mutual Insurance Company (the insurance company).

¶ 18. Pursuant to the terms of the liability insurance policy, the insurance company retained the Crivello Carlson law firm to represent it, Juneau County Sheriff Brent H. Oleson, and the County in matters involving the County as defendant in proceedings related to Jeremy Haske, a former deputy sheriff. The law firm performed services on the Haske matter in which the County was a defendant and sent invoices for this work directly to the insurance company. The insurance

company paid the law firm on the basis of the invoices. Neither the law firm nor the insurance company sent any invoices to the County.

¶ 19.   The liability insurance policy is silent about whether the County has any right to any records, including access to invoices arising from the law firm's defense of the County. No written contract between the law firm and the insurance company for this legal work is in the record. The record does not reveal what kind of invoices, if any, the insurance company sought from the law firm.

¶ 20.   On February 7, 2010, Peter Rebhahn, a reporter with the Star-Times, sent a letter to Kathleen Kobylski, the Juneau County Clerk, requesting access to any legal bills from the law firm submitted to the insurance company for services rendered as counsel to the County in the Haske matters.[10]

¶ 21.   Three days later, on February 10, 2010, after conferring with Juneau County Corporation Counsel David Lasker, Attorney Michele Ford of the law firm provided redacted invoices related to the Haske matters to Mr. Rebhahn. Attorney Ford's letter explained that "[t]he invoices have been redacted to exclude information that is privileged by statute and common law." Attorney Ford also sent the redacted invoices to the County, along with a copy of the letter to Mr. Rebhahn.

¶ 22.   On February 16, 2010, George Althoff, the Star-Times Publisher, sent a follow-up letter to County Clerk Kobylski, renewing the newspaper's request for

---

[10] The letter specifically asked for "access to bills submitted for payment to Juneau County's insurer, the Wisconsin County Mutual Insurance Corp., by Michele Ford, or submitted by her law firm, Crivello Carlson, for services Attorney Ford rendered as counsel to Juneau County Sheriff Brent Oleson in the years 2008, 2009 and 2010."

records, asserting that the February 10 response from the law firm ignored the original request. Clerk Kobylski responded by letter on February 17, 2010, explaining that all redacted content in the legal invoices is privileged under applicable law and refusing to provide anything further.

¶ 23. The Star-Times then filed an action for mandamus and declaratory relief against the County on March 9, 2010, seeking disclosure of the redacted portions of the legal invoices. The County answered the complaint, denying all claims. The parties filed cross-motions for summary judgment.

¶ 24. On August 26, 2010, the circuit court granted the summary judgment motion in favor of the County. On appeal by the Star-Times, the court of appeals ruled in favor of the Star-Times.

II

¶ 25. This case involves the interpretation and application of the Public Records Law to undisputed facts, presenting a question of law that this court determines independently while benefitting from the analyses of both the circuit court and the court of appeals.[11]

_____

[11] *Milwaukee Journal Sentinel v. City of Milwaukee*, 2012 WI 65, ¶ 17, 341 Wis. 2d 607, 815 N.W.2d 367 (Abrahamson, C.J., lead op.).

At the circuit court, each party filed a motion for summary judgment. We review a circuit court's grant or denial of a summary judgment motion independently of either the circuit court or the court of appeals. We apply the same methodology and benefit from their analyses. *WIREdata v. Village of Sussex*, 2008 WI 69, ¶ 44, 310 Wis. 2d 397, 751 N.W.2d 736. Summary

¶ 26. We shall in the instant case, as in prior cases, examine numerous sources in interpreting and applying the Public Records Law, including the text and context of relevant provisions, the interpretation proffered by the Attorney General, the legislature's Declaration of Policy in Wis. Stat. § 19.31, and interpretations of the relevant statutory provisions in prior cases.[12]

## III

¶ 27. We turn first to the text of Wis. Stat. § 19.36(3), the contractors' records provision. The general rule is that a record under the Public Records Law is a record created or kept by an authority. Wis. Stat. § 19.32(2).[13] The contractors' records provision provides that even if a record is not created by or kept by an authority, the record is subject to the Public Records Law if it is "produced or collected under a contract entered into by the authority with a person other than an authority to the same extent as if the record were maintained by the authority." The contractors' records provision is designed to prevent a government entity from evading its responsibilities under the Public

---

judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. The facts in the present case are undisputed. There are no competing reasonable inferences preventing summary judgment on the question of law whether Wis. Stat. § 19.36(3) applies to the invoices.

[12] *Milwaukee Journal Sentinel,* 341 Wis. 2d 607, ¶ 18 (Abrahamson, C.J., lead op.); *Schill v. Wis. Rapids Sch. Dist.,* 2010 WI 86, ¶ 21, 327 Wis. 2d 572, 786 N.W.2d 177 (Abrahamson, C.J., lead op.).

[13] *Machotka v. Village of West Salem,* 2000 WI App 43, ¶ 6, 233 Wis. 2d 106, 607 N.W.2d 319.

Records Law by shifting a record's creation or custody to an agent.[14]

¶ 28.   Section 19.36(3) reads as follows:

Contractors' Records. Subject to sub. (12), each authority shall make available for inspection and copying under s. 19.35(1) any record produced or collected under a contract entered into by the authority with a person other than an authority to the same extent as if the record were maintained by the authority. This subsection does not apply to the inspection or copying of a record under s. 19.35(1)(am).

¶ 29.   No one disputes that the County is an authority as defined in the Public Records Law.[15] No one disputes that the liability insurance policy is "a contract entered into by" the County with the insurance company, and no one disputes that the insurance company is not an authority.

¶ 30.   The dispute revolves around whether the invoices prepared by the law firm that contracted with the insurance company to furnish legal services to the County were produced or collected under the liability insurance policy, a contract between the County and the insurance company.

¶ 31.   To resolve the dispute we must explore the meaning of the key words in Wis. Stat. § 19.36(3) governing the present dispute:   "produced," "collected," and "under." Three different approaches have been presented to the court.

¶ 32.   The circuit court focused on the word "*produced*" and concluded that the invoices were not produced under a contract between the County and the

[14] *Machotka,* 233 Wis. 2d 106, ¶ 8.
[15] *See* Wis. Stat. § 19.32(1).

135

insurance company. The County agrees with this position and argues here that no separate contract exists between the County and the law firm retained by the insurance company.

¶ 33. The word "produce" has numerous definitions: to bring forth; to yield; to create by intellectual or physical effort; to make; to generate; to manufacture; to cause to occur or exist; to give rise to or to happen; to form or shape.

¶ 34. The court of appeals focused on the word "*collected*" and concluded that the invoices were "collected" under a contract between the County and the insurance company. The court of appeals reasoned that the insurance company's mandatory obligation under the liability insurance policy to defend the County will necessarily result in the insurance company's collecting some form of invoice from the law firm.[16] The court of appeals rejected the County's argument that the invoices were collected under whatever agreement existed between the insurance company and the law firm, not the contract between the County and the insurance company.[17]

¶ 35. The word "collect" also has numerous definitions: to gather; to bring together in a group or mass; to receive, gather, or exact from a number of persons or other sources.

---

[16] *Star-Times,* 337 Wis. 2d 710, ¶ 17.

[17] The Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, and the Wisconsin Broadcasters Association submitted a nonparty brief supporting the position of the court of appeals and the Star-Times. The brief argued that the contractors' records provision precludes government from performing an "end run" around the Public Records Law by contracting away the public's access to information.

¶ 36. In contrast, the Department of Justice focuses its nonparty brief on the word *"under"* in the statutory phrase "collected or produced under a contract."[18] The Department examines dictionary definitions of the word "under" (along with other materials) and concludes that "the § 19.36(3) language 'record produced or collected under a contract' means records produced or collected *as required by or as obligated by a contract*" (emphasis added).

¶ 37. The Department substitutes the words "as required by or obligated by" for the word "under." But other substitutes for the word "under" exist that have different connotations than "required by" or "obligated by." "Under," in reference to a contract, may be used to

[18] The Department of Justice plays a special role in the Public Records Law. The legislature has accorded the Attorney General, who supervises and directs the Department of Justice, special significance in interpreting the Public Records Law. The legislature has specifically authorized the Attorney General to advise any person about the applicability of the law. Wis. Stat. § 19.39. The Attorney General has not issued a formal or informal opinion letter or other document regarding the issue presented in the instant case. Rather, the Department of Justice has filed a nonparty brief expressing its view. The Attorney General's opinion, advice, and brief are not binding on this court, but we may give them persuasive effect. *Milwaukee Journal Sentinel,* 341 Wis. 2d 607, ¶ 41 (Abrahamson, C.J., lead op.).

The Department of Justice is critical of the court of appeals' interpretation of Wis. Stat. § 19.36(3) as defining "under" too broadly and in effect allowing release of all records connected to the subject matter of any contract between an authority and its contractor. The County agrees with the Department, arguing that the court of appeals effectively transforms private records into public records, an unwarranted intrusion into the affairs of the private entity.

mean in accordance with, pursuant to, in compliance with, in carrying out, subject to, or because of a contract.

¶ 38. The Department claims its interpretation of Wis. Stat. § 19.36(3) is supported by the history of the statute. The Department rests its interpretation of § 19.36(3) on a slim reed of unexplained changes to the draft as it worked its way through the legislature before the final language was enacted. When first proposed, the statute included language that in part defined a contractor's record as one "used in connection with the performance" of contractual services. The Department argues that removal of this language from the final bill indicates that the legislature intended to narrow the scope of the provision. There are, however, many possible reasons why particular language may fall by the wayside before a bill becomes a law, and the failure of the legislature to enact particular language has limited persuasive value.[19]

¶ 39. Applying its interpretation of Wis. Stat. § 19.36(3) to the present case, the Department concludes that the production or collection of invoices was not required by the liability insurance policy; rather, the invoices were the product of an agreement between the insurance company and the law firm.

¶ 40. This interpretation and application of Wis. Stat. § 19.36(3) is very narrow. It seems contrary to the legislature's directive that it is the public policy of the state that all persons are entitled to the greatest

_____

[19] *Mead Corp. v. Tilley,* 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (quoting *Trailmobile Co. v. Whirls,* 331 U.S. 40, 61 (1947)).

possible information regarding the affairs of government and the official acts of those officers and employees who represent them. Wis. Stat. § 19.31. We shall return to the public policy argument later. Moreover, this reading of § 19.36(3) may permit an authority and contractor to draft a contract to evade Wis. Stat. § 19.36(3) by delegating a record's creation and custody to an agent.[20]

¶ 41. Like the circuit court, the court of appeals, and the Department of Justice, we explore the meaning and application of the key words in Wis. Stat. § 19.36(3) governing the present dispute: "produced," "collected," and "under." These words are not technical or specialized words. They are words with commonly understood meanings, as we described above, that should be used in interpreting and applying the Public Records Law.[21] The statutory text is constant, but each of these words may have a different meaning and application depending on the fact situation.

¶ 42. The meaning of these words used separately and together in Wis. Stat. § 19.36(3) must be found in

---

[20] *See Journal/Sentinel, Inc. v. School Bd. of Shorewood,* 186 Wis. 2d 443, 452–53, 521 N.W.2d 165 (Ct. App. 1994) (the purpose of the contractors' records provision is to prevent an authority from evading its responsibilities under the Public Records Law by delegating a record's creation and custody to an agent).

[21] Wisconsin Stat. § 990.01(1) provides as follows:

Construction of laws; words and phrases. In the construction of Wisconsin laws the words and phrases which follow shall be construed as indicated unless such construction would produce a result inconsistent with the manifest intent of the legislature:

(1) General Rule. All words and phrases shall be construed according to common and approved usage; but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning.

their context. Context usually refers to the relationship of the words at issue to other provisions in the statute or to other statutes. Context can also mean the factual setting in which the words are to be applied.[22] The implication of each of these words in § 19.36(3) may vary somewhat according to the circumstances in which § 19.36 is applied. The circumstances to which these statutory words apply are myriad.

¶ 43. We therefore interpret and apply the statute and the words "collected," "produced," and "under" in Wis. Stat. § 19.36(3), in their commonly understood meanings, in the context of the factual setting of the present case. The factual setting here is the tripartite relationship of the County, the insurance company, and the law firm based on the liability insurance policy.

¶ 44. The instant case presents the classic tripartite relationship between an insured, an insurance company, and a law firm retained by the insurance company to represent the insured. We have described this tripartite relationship previously. The liability insurance policy is the basis of a contractual relationship between the County and the insurance company. It is the basis of a contractual relationship between the insurance company and the law firm. It is the basis of a contractual attorney-client (agency) relationship between the law firm and the County.

██

¶ 45. When an insurance company retains a law firm to defend an insured in an action, it does so pursuant to the liability insurance policy. The insur-

---

[22] *Seider v. O'Connell*, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659 ("Context usually refers to the relationship with other statutes. Context also can mean factual setting.") (internal citation omitted).

ance company's retention of a law firm to represent the insured (here the County) and the insured's (the County's) acceptance of the representation pursuant to the liability insurance policy create an attorney-client relationship between retained counsel (the law firm) and the insured (the County).[23]

¶ 46.   The law firm has duties owing to both the insurance company and the insured pursuant to the liability insurance policy.[24] And the insurance company and insured have duties owing to the law firm pursuant to the liability insurance policy.

¶ 47.   The insured is required under the liability insurance policy to assist the insurance company (and the law firm that the insurance company retains). In the instant case representatives of the County, includ-

---

[23] *Meixell v. Superior Ins. Co.,* 230 F.3d 335, 341 (7th Cir. 2000) (an attorney retained by an insurance company to defend the insured assumes all the duties imposed by the attorney-client relationship); *Homberger v. Wendel,* 764 N.W.2d 371, 376 (Minn. App. 2009) (insurance defense counsel has attorney-client relationship with insured) (quoting *Pine Island Farmers Coop v. Erstad & Riemer, P.A.,* 649 N.W.2d 444, 449 (Minn. 2002)); 2 Restatement (Third) of The Law Governing Lawyers § 134 cmt. f (2000) ("It is clear in an insurance situation that a lawyer designated to defend the insured has a client-lawyer relationship with the insured. The insurer is not, simply by the fact that it designates the lawyer, a client of the lawyer.").

[24] "The relationship of attorney and client is one of agency." *Marten Transport Ltd. v. Hartford Specialty Co.,* 194 Wis. 2d 1, 13, 533 N.W.2d 452 (1995). *See also Majorowicz v. Allied Mut. Ins. Co.,* 212 Wis. 2d 513, 525, 569 N.W.2d 472 (Ct. App. 1997); *Security Bank v. Klicker,* 142 Wis. 2d 289, 295, 418 N.W.2d 27 (Ct. App. 1987).

ing corporation counsel, consulted directly with the law firm with regard to the litigation, pursuant to the liability insurance policy.[25]

¶ 48.    The tripartite relationship in the context of an insurance policy is unique.[26] "These relationships among a liability insurer, its insured, and the attorney chosen by the insurer to represent the insured are sui generis."[27] Insurance defense counsel are generally recognized as having two clients in any given case:    the insurer and the insured.[28] This situation is unique

---

[25] There was substantial direct interaction between the law firm and the County. Attorney Michele Ford of the law firm met with Sheriff Oleson multiple times to prepare his defense. She corresponded with David Lasker, the County's Corporation Counsel, and with County Clerk Kobylski in preparing a defense. She prepared documents to be approved by David Lasker. Attorney Ford had also been the public face of the County, representing it in court in the Haske matters, a case which drew significant public attention.

An authority's attorney-client relationship with a law firm may have significant ramifications for the County. For a discussion of some possible significant ramifications of an attorney-client relationship to an authority, see *Journal/Sentinel, Inc.*, 186 Wis. 2d at 453–54.

[26] Compare *Marten Transport Ltd. v. Hartford Specialty Co.*, 194 Wis. 2d 1, 18, 533 N.W.2d 452 (1995) (internal citation omitted) (No tripartite relationship existed because the law firm was hired by the insured and was not retained or paid by the insurance company which functioned primarily as a workers compensation claims administrator for the insured.).

[27] *Moritz v. Medical Protective Co.*, 428 F. Supp. 865, 872 (W.D. Wis. 1977).

[28] Douglas R. Richmond, *Walking a Tightrope:    The Tripartite Relationship Between Insurer, Insured, and Insurance Defense Counsel*, 73 N. L. Rev. 265, 270 (1994). *See also* State Bar of Wisconsin, Wisconsin Ethics Opinions, Formal Opinion

because a party is not ordinarily represented by counsel selected and paid for by a third party whose interests may not be the same as those of the individual or entity the attorney was hired to represent.

¶ 49. The tripartite relationship in the present case is different from the typical relationships contemplated by Wis. Stat. § 19.36(3) between an authority, a contractor and a subcontractor of the contractor. The County in the present case has a direct contractual relationship with the law firm pursuant to the liability insurance policy. The County and the law firm have an attorney-client relationship formed pursuant to the liability insurance policy.

¶ 50. The County attempts to characterize the law firm as contracting solely with the insurance company and thus as a subcontractor of the insurance company. In the ordinary business relationship between an authority, a contractor, and a subcontractor of the contractor, the authority does not have a direct contractual relationship with the subcontractor; the subcontractor is not an agent of the authority; and the authority does not work directly with the subcontractor. The tripartite relationship in the liability insurance policy context differs in each of these respects from the authority/contractor/subcontractor situation.

---

E-99-1 (2011) ("Wisconsin lawyers retained by insurers under a policy of insurance typically represent both the insurer and insured in the defense of claims. . . . Counsel who regularly represent insureds usually have ongoing attorney-client relationships and economic ties to those insurers."). The law firm's relationship with both the insurance company and the insured is permitted under the Wisconsin Rules of Professional Conduct for Attorneys as an exception to the general rule that a lawyer shall not accept compensation from a third party for representing a client. SCR 20:1.8(f)(1).

¶ 51. We consider the unique tripartite relationship in the present case and conclude that the contractors' records provision applies to the invoices in the insurance policy context. To say that the invoices sought by the Star-Times are private records produced and collected pursuant to the private contractual relationship between the insurance company and the law firm ignores the unique, direct attorney-client agency relationship between the County and the law firm in the present case based on the liability insurance policy.

¶ 52. The invoices relating to the County's defense in the Haske matters were generated (that is, "produced or collected," according to the common usage of these words), pursuant to (that is, "under," according to the common usage of this word) the liability insurance policy between the County and the insurance company, which established a contractual, attorney-client relationship between the law firm and the County. To characterize the invoices as solely private records under an agreement between the insurance company and the law firm is to turn a blind eye to the realities of the relationship between the County, the insurance company, and the law firm in the present case.

¶ 53. With regard to the significance of the County's attorney-client relationship with the law firm for purposes of Wis. Stat. § 19.36(3), *Journal/Sentinel, Inc. v. School Board of Shorewood,* 186 Wis. 2d 443, 521 N.W.2d 165 (Ct. App. 1994), is instructive, although the fact situation differs from that in the present case. In *Journal/Sentinel,* the court of appeals explicitly relied on the authority's attorney-client relationship to mandate the production of a document kept by the attorney.

¶ 54. The attorney in *Journal/Sentinel* was hired by the school board and prepared a memorandum of understanding reciting the terms of a settlement with

the school district's former superintendent. The school board refused to produce the memorandum, arguing that the document was created by and kept by the attorney, not the school board, and therefore was not a record under the Public Records Law. The school board also argued that Wis. Stat. § 19.36(3) does not apply because the attorney's contract with the board was to provide legal services, not a memorandum of understanding.[29]

¶ 55.   The *Journal/Sentinel* court quickly shelved these arguments and concluded that a public body may not avoid the public access mandated by the Public Records Law by delegating both record creation and custody to an agent.[30] The court of appeals reasoned that the document was produced during the course of the attorney's representation of the school board and is a contractor's record subject to disclosure under Wis. Stat. § 19.36(3) of the Public Records Law.

¶ 56.   The facts in the present case differ from those in *Journal/Sentinel.* In the *Journal/Sentinel* case, the authority (the school board) contracted directly with the attorney for legal services. In the present case, the insurance company, not the County, contracted with the law firm to provide legal services for the County. Nevertheless, by procuring the liability insurance policy and by allowing the insurance company to retain counsel for it, the County in the present case has in effect contracted with the law firm for legal services and

---

[29] *Journal/Sentinel, Inc.,* 186 Wis. 2d at 453.

[30] *Id.* at 452–53.

No one claims that the County attempted to circumvent the Public Records Law here. But the Public Records Law does not require an authority to intend to circumvent the law before the contractors' records provision becomes applicable and the contractors' records are accessible.

has created an attorney-client relationship with the law firm similar to the relationship that would have been created had the County and the law firm contracted directly. *Journal/Sentinel* teaches that when a public authority contracts for legal services, a record created and kept by the attorney may be subject to the Public Records Law.

■

¶ 57.    Because the liability insurance policy is the basis for the tripartite relationship between the County, the insurance company, and the law firm and is the basis for an attorney-client relationship between the law firm and the County, we conclude that the invoices that were produced or collected during the course of the law firm's representation of the County pursuant to the liability insurance policy come under the liability insurance policy. Wisconsin Stat. § 19.36(3) therefor governs the accessibility of the invoices.

¶ 58.    We consider now the Department of Justice's contention that public policy does not support such an interpretation of Wis. Stat. § 19.36(3). The Department asserts that its narrower interpretation advances the public policy of facilitating oversight of public entities while protecting the private financial relationship between the insurance company and the law firm, a private relationship that is not a legitimate matter of public interest.

¶ 59.    To evaluate the Department's argument that allowing access to the invoices does not comport with the public policy underlying the Public Records Law, we examine the legislature's declaration of policy in Wis. Stat. § 19.31.

¶ 60.    The court has recognized that the legislature's "statement of public policy in [Wis. Stat.]

146

§ 19.31 is one of the strongest declarations of policy to be found in the Wisconsin statutes."[31]

¶ 61.  The legislature has instructed that the Public Records Law be construed "with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied."[32]

¶ 62.  The Department of Justice argues that the legislatively established public policy does not apply to the instant case because the invoices are private records generated by a private entity and delivered to a private entity and do not relate to the affairs of government. The Department claims that other records subject to the Public Records Law are available for oversight in the present case and that the requesters have not explained why members of the public need the invoices from a private law firm and a private insurance company to exercise meaningful oversight of Deputy Haske's conduct, costs, or the County's legal liability

---

[31] *Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶ 49, 300 Wis. 2d 290, 731 N.W.2d 240.

[32] Wisconsin Stat. § 19.31 states:

In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them. Further, providing persons with such information is declared to be an essential function of a representative government and an integral part of the routine duties of officers and employees whose responsibility it is to provide such information. To that end, ss. 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

147

coverage.[33] That a requester may seek other records does not, however, prohibit a requester from seeking these records if they are accessible under Wis. Stat. § 19.36(3).

¶ 63.   The Star-Times argues persuasively that its position comports with the public policy embodied in the Public Records Law. It points out that if Wis. Stat. § 19.36(3) does not apply to the invoices, it will not apply to other documents produced by the law firm while defending the County under the insurance policy, such as a memorandum of understanding or a settlement agreement the law firm negotiates.

¶ 64.   The invoices were produced by the law firm during its representation of the County based on the liability insurance policy. The invoices therefore have a clear connection to the County's attorney-client relationship with the law firm and the liability insurance policy.

---

[33] The Department of Justice seems to question the purpose of the request for the invoices. A request for records may not be refused because the requester "is unwilling . . . to state the purpose of the request." Wis. Stat. § 19.35(1)(i). The Star-Times' brief does claim a public purpose. It asserts that the invoices may inform the public about the use of taxpayers' dollars and give the public information about allegations of misconduct and how the allegations are handled. The Star-Times does not expand on this thesis, but it has not made the purpose of the request the linchpin of its argument. We therefore need not discuss the purpose of the Star-Times' request further. Compare *Building & Construction Trades Council v. Waunakee Community School District,* 221 Wis. 2d 575,587 n.4, 585 N.W.2d 726 (Ct. App. 1998), in which the records requester made the reasons underlying its request the linchpin of its public-policy argument to get access to records prepared and kept by a subcontractor.

¶ 65.   Accordingly, we conclude that access to the invoices in the present case comes within the text of Wis. Stat. § 19.36(3) and is consistent with the legislative policy of "making available those documents whose contents are related to the affairs of government, to the official acts of officers and employees, and to 'the conduct of governmental business.' "[34]

## IV

¶ 66.   Finally, we turn to prior court interpretations of Wis. Stat. § 19.36(3) to determine whether our interpretation and application of Wis. Stat. § 19.36(3) in the present case comport with the case law. It is important to acknowledge, as do the parties and the amici, that none of the prior cases is directly on point. We agree with the Department of Justice that "[t]he attorney invoices at issue in the present case fall somewhere between" the published decisions.

¶ 67.   Each published decision presents a different fact situation, and none addresses the tripartite attorney-client relationship relevant here. Still, an examination of the case law demonstrates that our holding is consistent with the principles set forth in the prior cases.

¶ 68.   We recently discussed Wis. Stat. § 19.36(3) in *WIREdata, Inc. v. Village of Sussex,* 2008 WI 69, 310 Wis. 2d 397, ¶¶ 79–89, 751 N.W.2d 736, in deciding whether an authority may direct a requester to seek records about property assessments from an independent contractor assessor. In *WIREdata,* the authority

---

[34] *Schill,* 327 Wis. 2d 572, ¶ 80 (Abrahamson, C.J., lead op.).

contracted directly with an independent contractor to complete property assessments, and the contractor maintained the records.

¶ 69. The *WIREdata* court concluded that municipalities could not avoid liability under the Public Records Law by contracting with independent contractor assessors for the collection, maintenance, and custody of property assessment records.[35] The court concluded that the property assessment records collected and kept by the independent contractor assessors were within the scope of the contract between the authority and the assessor and were therefore records within the purview of the contractors' records provision in Wis. Stat. § 19.36(3).

¶ 70. The present case is consistent with the principles that guided the *WIREdata* decision. In the present case, unlike in the *WIREdata* case, the authority (the County) did not contract directly with the independent contractor (the law firm) who maintained the invoices. We have concluded in the present case, however, that the County had a contractual relationship (attorney-client) with the law firm based on the liability insurance policy, a contract between the County and the insurance company. Furthermore, pursuant to the liability insurance policy between the County and the insurance company, there was substantial direct interaction between the County and the law firm; both the law firm and the County had obligations to each other pursuant to the liability insurance policy regarding the conduct of the litigation and apparently both met their obligations. Thus, here as in *WIREdata,* the records requested were produced or collected under

---

[35] *WIREdata,* 310 Wis. 2d 397, ¶¶ 82, 84.

a contract between the authority and the contractor. The invoices are therefore subject to Wis. Stat. § 19.36(3).

¶ 71. The court of appeals has addressed Wis. Stat. § 19.36(3) in *Journal/Sentinel* (which we have discussed previously) and again in *Machotka v. Village of West Salem,* 2000 WI App 43, 233 Wis. 2d 106, 607 N.W.2d 319, and *Building & Construction Trades Council v. Waunakee Community School District,* 221 Wis. 2d 575, 585 N.W.2d 726 (Ct. App. 1998). Our ruling in the present case is consistent with both cases.

¶ 72. In *Machotka,* the Village of West Salem had sold municipal bonds to Robert W. Baird & Company, which then sold the bonds to investors. The issue before the court of appeals was whether the contractors' records provision required the Village to provide a record requester with the names of the ultimate purchasers of the municipal bonds. The contract between West Salem and Baird did not provide that the Village would learn the identities of the ultimate bond purchasers, and it was not standard industry practice to reveal those names.[36]

¶ 73. The court of appeals concluded that Baird's record of sales to ultimate investors was not a record produced or collected under Baird's contract with the Village. Baird contracted with the Village only to underwrite the bond issue, and anything else it did—such as its sale of the bonds to others—"was undertaken for Baird's own purposes and its own benefit, not the Village's."[37] The records Baird kept of its sale of the Village's bonds to investors were kept for its own purposes, and were not in any way part of the contract

[36] *Machotka,* 233 Wis. 2d 106, ¶ 2, n.2.

[37] *Id.,* ¶ 9.

with the Village. The records sought were created after Baird's contractual obligations to the Village were completed.[38]

¶ 74. In contrast, in the present case the insurance company's contractual obligation to the County was to pay the County's attorney fees. The invoices at issue were produced by the law firm pursuant to its work for its clients, the County and the insurance company, under the liability insurance policy. Inasmuch as the invoices at issue in the present case were produced or collected pursuant to the contract between the authority (the County) and the contractor (the insurance company), they are subject to Wis. Stat. § 19.36(3).

¶ 75. The court of appeals also addressed Wis. Stat. § 19.36(3) in *Building & Construction Trades Council v. Waunakee Community School District,* 221 Wis. 2d 575, 585 N.W.2d 726 (Ct. App. 1998), in which the school district entered into a construction contract with a general contractor who in turn entered into contracts with subcontractors to perform certain work on a school construction project. The issue before the court of appeals was whether the Public Records Law, Wis. Stat. § 19.36(3), considered in light of the prevailing wage law, § 66.293, required the school district to obtain payroll records from the subcontractors and provide them to a record requester.

¶ 76. More specifically, the question presented was whether Wis. Stat. § 19.36(3) was applicable when the subcontractors' records sought were not produced or collected under the school district's contract with the contractor, but rather were produced entirely under

---

[38] *WIREdata,* 310 Wis. 2d 397, ¶ 87.

other contracts, namely the contracts between the contractor and the subcontractors, to which the school district was not a party.

¶ 77.  For Wis. Stat. § 19.36(3) to apply, the court of appeals required the records requester to provide the court with authority that would "bridge the gap" between the requirement in Wis. Stat. § 19.36(3) that the school district disclose records produced or collected under its contract with the contractor and the fact that the payroll records requested were the internal records of two entities that had entered into subcontracts with the contractor—subcontracts to which the school district was not a party.

¶ 78.  After careful and detailed analysis of the prevailing wage laws that govern payroll records and the enforcement methods of the wage laws, the court of appeals concluded that the wage laws regarding monitoring the prevailing wage rates and hours of work for employees of private employers working on public works projects did not "bridge the gap." The court of appeals ruled that for numerous reasons, the prevailing wage laws did not render the payroll records of the subcontractors within the purview of the contract between the school district and the contractor or the public policy of the Public Records Law.

¶ 79.  The County argues that there is a gap between the requirement in Wis. Stat. § 19.36(3) that the County disclose records produced or collected under its contract with the insurance company (the liability insurance policy) and the fact that the invoices requested were records generated and submitted by the law firm to the insurance company on the basis of the contract between the law firm and the insurance company. We conclude that there is no gap in the present case. The invoices were generated and submitted as a

153

result of the tripartite relationship of the County, insurance company and law firm pursuant to the liability insurance policy. The liability insurance policy is a contract between the County and the insurance company. We thus conclude that our ruling today comports with the *Building & Construction Trades* case.

* * * *

¶ 80.   In sum, we affirm the decision of the court of appeals. We use somewhat different reasoning, however. We too conclude that the invoices are contractors' records under Wis. Stat. § 19.36(3). Our decision is based on the tripartite relationship of the County, the insurance company, and the law firm, all arising from the liability insurance policy.

¶ 81.   The tripartite relationship arising from the liability insurance policy is as follows:

(1) The liability insurance policy is the basis of a contractual relationship between the County and the insurance company:   The insurance company agrees in the liability insurance policy to pay damages the County owes and to pay attorney fees incurred for the County's defense.

(2) The liability insurance policy is the basis of a contractual relationship between the insurance company and the law firm:   The insurance company retains the law firm, pursuant to the liability insurance policy, to represent the County and agrees to pay the attorney fees. The law firm that accepts the assignment undertakes the County's representation in accordance with the liability insurance policy.

(3) The liability insurance policy is the basis of a contractual relationship between the law firm and the County:   Pursuant to the liability insurance policy, the law firm retained by the insurance company enters into

a contractual attorney-client (agency) relationship with the County.

¶ 82. The liability insurance policy thus is the basis for contractual relationships between the County and the insurance company, as well as between the insurance company and the law firm, and the law firm and the County.

¶ 83. The invoices—the billings for the law firm's legal work performed as the County's defense counsel and the insurance company's retained counsel—were produced or collected in the course of the law firm's representation of the County and the insurance company under the liability insurance policy between the County and the insurance company. Because the liability insurance policy is the basis for the tripartite relationship between the County, the insurance company, and the law firm, and is the basis for an attorney-client relationship between the law firm and the County, we conclude that the invoices were produced or collected during the course of the law firm's representation of the County and the insurance company pursuant to the liability insurance policy; the liability insurance policy is a contract entered into by the County and the insurance company. Thus, the requirements of Wis. Stat. § 19.36(3) have been met and § 19.36(3) governs the accessibility of the invoices.

¶ 84. We affirm the decision of the court of appeals and remand the proceeding to the circuit court to order the County to make available to the Star-Times unredacted copies of the invoices.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 85. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). I join the majority opinion in concurrence. I

write separately to reiterate a point that the majority opinion emphasizes: our decision in this case does *nothing* to alter the rules governing attorney-client privilege, attorney work-product, or any other duties involving attorney confidentiality. *See* majority op., ¶¶ 14–15. The parties neither briefed nor argued these issues, and the court properly declines to address these issues. Accordingly, I respectfully concur.

¶ 86. DAVID T. PROSSER, J. (*dissenting*). The majority opinion permits Wisconsin's public records law to breach privileged communications, contrary to sound public policy and the text of the public records statute. The majority's assurance that the opinion "does not alter the rules governing confidentiality, attorney-client privilege, or lawyers' work product, or any other rules protecting against disclosure," majority op., ¶ 15, is unpersuasive given the opinion's analysis and its other declarations. Because I believe the opinion has serious negative ramifications for the practice of law, I respectfully dissent.

I

¶ 87. Juneau County (the County) contracted with Wisconsin County Mutual Insurance Corporation (County Mutual) to provide public entity liability insurance for the County. Under this insurance policy (or insurance contract), County Mutual committed itself to pay damages that the County became legally obligated to pay as the result of a covered occurrence. The policy also covered attorney fees and costs related to defending a claim. The public entity liability policy was similar to insurance policies acquired by a multitude of Wisconsin municipalities and likely parallel to the liability policies acquired by innumerable non-public entities such as businesses and nonprofits.

156

¶ 88.   In 2008 Juneau County Sheriff Brent Oleson suspended one of his deputies, Jeremy Haske, for alleged misconduct. This action led to litigation, including two lawsuits by Haske against the sheriff. The County called upon its insurer, County Mutual, to provide a defense. County Mutual assigned the Milwaukee law firm of Crivello Carlson, S.C. (Crivello Carlson) to provide representation.

¶ 89.   In the midst of this litigation, the Juneau County Star-Times (Star-Times) made a public records request through the Juneau County Clerk. The Star-Times requested access to any legal bills for 2008, 2009, and 2010 submitted by Crivello Carlson to County Mutual for its representation of the County in the Haske matters.

¶ 90.   The record shows that Attorney Michele M. Ford (Attorney Ford) of Crivello Carlson, after conferring with the County's corporation counsel, supplied the Star-Times with 27 pages of redacted legal invoices that it had submitted to County Mutual. These invoices were dated February 16, 2009; June 8, 2009; August 20, 2009; or September 22, 2009, respectively. The redacted invoices showed total hours in each reporting period; total attorney fees in each reporting period; and other disbursements in each reporting period. They revealed the days Attorneys Ford, John T. Juettner, and Linda J. Slawson worked on the cases but did not reveal the exact amount of time that an attorney put in on a given day. Most significantly, the invoices did not disclose what an attorney was doing on a given day.

¶ 91.   Attorney Ford explained in a cover letter to the Star-Times that "The invoices have been redacted to exclude information that is privileged by statute and common law. Access to records may be denied where

157

there is a specific statutory exemption to disclosure, Wis. Stat. § 19.36, or where there is a common law or public policy exception."

¶ 92.   Attorney Ford cited Wis. Stat. § 905.03, the lawyer-client privilege statute. She also cited "the privileged status of attorney work product." "The presumption of access under [Wis. Stat.] § 19.35(1)(a) is defeated because the attorney work product qualifies under the 'otherwise provided by law' exception."

¶ 93.   When the County declined to release additional information from the legal invoices, the Star-Times filed suit in Juneau County Circuit Court.

¶ 94.   Adams County Circuit Judge Charles A. Pollex was sent to Juneau County to hear the case. He determined that while Juneau County was an "authority" under the public records law, "There is no evidence before the court that the information in question has been created by nor that it is being kept by Juneau County."

¶ 95.   Because the unredacted invoices were not a Juneau County "record," the court next considered whether the legal invoices were a "contractor record" under Wis. Stat. § 19.36(3). The court concluded that:

> The invoices for attorney's fees rendered are, as far as this summary judgment record is concerned, a private matter between the Crivello Carlson law firm and Wisconsin County Mutual Insurance Corp. and any connection between the invoices and Juneau County's contract with Wisconsin County Mutual Insurance Corp. is tenuous at best.

Thus, the court held that the invoices did not qualify under § 19.36(3).

¶ 96.   In addition, the circuit court found that "the invoices contain detailed descriptions of the nature of

the legal services rendered to Juneau County. Producing these billing records would, therefore[,] reveal the substance of lawyer-client communications and fall within the purview of the lawyer-client privilege."

¶ 97. The court of appeals reversed, rejecting the County's explanation of the redactions and the circuit court's determinations. It directed the circuit court "to order the County to make available to the Star-Times *unredacted* copies of the invoices." *Juneau Cnty. Star-Times v. Juneau Cnty.*, 2011 WI App 150, ¶ 2, 337 Wis. 2d 710, 807 N.W.2d 655 (emphasis added). The majority now affirms this conclusion without directly discussing the lawyer-client privilege or lawyer work product.

¶ 98. In short, the majority determines that this case can be decided by its construction of Wis. Stat. § 19.36(3).

## II

¶ 99. Wisconsin Stat. § 19.36(3) reads as follows:

Contractors' Records. Subject to sub. (12), each authority shall make available for inspection and copying under s. 19.35(1) any record produced or collected under a contract entered into by the authority with a person other than an authority to the same extent as if the record were maintained by the authority. This subsection does not apply to the inspection or copying of a record under s. 19.35(1)(am).

¶ 100. The crucial words in this subsection are "any record produced or collected under a contract entered into by the authority."

¶ 101. The relationships in this case may be diagrammed using the three corners of a triangle. In one corner of the triangle is Juneau County (the insured).

In another corner is County Mutual (the insurer). There is indisputably a contract between these two "corners" and any record "produced" or "collected" "under" *this* contract is a "contractor record" under the statute, even though it was not created or kept by the County.

¶ 102. There is another corner to the triangle representing Crivello Carlson. Crivello Carlson has a contract with County Mutual. This contract is different from the County's insurance contract. We do not know the provisions of this contract; that is, we do not know the precise relationship between County Mutual and Crivello Carlson in terms of which Crivello Carlson attorneys will be involved in representing the public entities that County Mutual insures, how much the firm will be compensated for its services, when it will be compensated for its services, what sort of briefings Crivello Carlson must provide to the insurer, and what kind of invoices the firm must submit. We also do not know when this contractual relationship began. What we *do* know is that the County was not a party to this second contract and that the County did not select and did not have a right to select Crivello Carlson as its law firm.[1]

---

[1] The Legal Expense Coverage Endorsement to the insurance policy states: "*We* [County Mutual] have the right and duty to select counsel to handle any matter for which you have given notice of your intent to *seek legal expense coverage* under Coverage D." This particular provision covered legal expense coverage related to "*collective bargaining disputes,* disputes with regulatory agencies or disputes involving any operation of principles of eminent domain, condemnation proceedings or inverse condemnation."

The insurance policy provision relating to general legal defense and settlement reads as follows:

> *We* have the right and duty to defend any *suit* against the *insured* seeking monetary damages on account of *bodily injury,*

Crivello Carlson, by its own admission, was "assigned" to represent Juneau County.[2]

¶ 103. Crivello Carlson's invoices to County Mutual would not have been sent to the County but for the Star-Times public records request. Thus, the invoices were not "produced" for the County or "collected" for the County. They were "produced" or "collected" *under* the County's insurance contract only indirectly, raising the question whether an indirect connection is all the statute requires.

¶ 104. County Mutual must have contracts with providers for equipment and services that are paid for in part by Juneau County's insurance premiums. Thus, if Crivello Carlson's invoices are "under" the County's insurance contract, other invoices sent to County Mutual involving some interaction with the County may be "under" the insurance contract as well. This is why the Wisconsin Counties Association expressed concern that

---

*personal injury, property damage* or *errors and omissions* or any combination thereof, but:

> 1. The amount *we* pay for damages is limited as described in Section IV – Limits of Insurance;
>
> 2. *We* may, at *our* discretion, investigate any *occurrence* and settle any claim or *suit* that may result even if the settlement amount is exclusively within the *insured's* deductible; and
>
> 3. Our right and duty to defend end when we have used up the Limit of Insurance in the payment of judgments or settlements under Coverages A, B, or C. This applies to both claims and *suits* pending at that time and those filed thereafter.

*Defense costs* are payable in addition to the policy limit after any applicable deductible has been exhausted.

[2] *See* letter from Michele Ford to Juneau County Star-Times dated February 10, 2010.

the court of appeals decision—which the majority affirms—"suggests that an authority's duty to provide access to contractors' records is almost limitless."

¶ 105. The majority opinion commences its analysis with the simple proposition that "(1) The liability insurance policy is *the basis of* a contractual relationship between the County and the insurance company[.]" Majority op., ¶ 11 (emphasis added). This proposition may be true, but it is also true that the liability insurance policy *is* a contract. A contract gives rise to a contractual relationship. The majority opinion adopts "the basis of" phraseology, however, so that it can treat other relationships in the triangle as functionally equivalent to the County's insurance contract.

¶ 106. The majority's statement that "(2) The liability insurance policy is *the basis of* a contractual relationship between the insurance company and the law firm[,]" *id.*, ¶ 11 (emphasis added), is true only if the law firm's contractual relationship was initiated because of the County's liability insurance policy. This is not a fact of record.

¶ 107. The majority opinion also asserts that the attorney-client relationship between Crivello Carlson and Juneau County is a third "contractual" relationship. *Id.*, ¶ 11. This may not be true. A lawyer-client relationship is a fiduciary relationship.[3] It is often an agency relationship. But it is not necessarily a contractual relationship. The majority opinion's conclusory assertions to the contrary are overly sweeping, and they have not been supported with Wisconsin precedent.

[3] *See, e.g., Sands v. Menard, Inc.,* 2010 WI 96, ¶ 53, 328 Wis. 2d 647, 787 N.W.2d 384; *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 41, 312 Wis. 2d 251, 752 N.W.2d 800.

¶ 108. Once established and sanctified, the "tripartite" relationship described in the majority opinion is subject to application in other contexts. For instance, suppose an "authority" enters into a collective bargaining agreement (e.g., contract) with a public employee union. If the union later hires counsel to represent one of the authority's employees, must the union disclose the legal invoices it receives from hired counsel? Are these invoices contractor records because they are *indirectly* "under" the collective bargaining contract?

¶ 109. It is not difficult to apply the principles of the majority opinion to other situations involving legal representation as well as other sensitive relationships loosely related to an authority's contract.

¶ 110. Thus, the pivotal question before the court is whether records related only indirectly to a contract entered into by an authority are records "under" that contract that must be disgorged by the authority pursuant to the public records law.

¶ 111. The amicus Wisconsin Department of Justice (the DOJ) urges the court to interpret "any record produced or collected under a contract" as a record "required or obligated by a contract." It contends that the "statutory language, legislative history, and public policy all support this result."

¶ 112. The DOJ further argues that the legislature knew how to draft broader language describing contractor records in Wis. Stat. § 19.36(3) than it eventually chose. The DOJ concludes that because the legislature chose not to use broad language in § 19.36(3), the contractor records provision does not include any record "used in connection with the performance of contractual services." The DOJ believes that

the court of appeals decision wrongly adopts the "used in connection with" concept for the contractor records provision in § 19.36(3).

¶ 113.  The DOJ points to legislative history in its analysis. The legislature created Wis. Stat. § 19.36(3) in ch. 335, Laws of 1981 (Chapter 335). Chapter 335 was based on amended 1979 Senate Bill 482 that failed to pass (SB 482). Drafting File, ch. 335, Laws of 1981, Legislative Reference Bureau, Madison, Wis. Senate Bill 482 did not include a contractor records provision like the current § 19.36(3). However, SB 482, as amended, added a defined term, "maintains," in regard to personal data maintained by an authority.[4] This defined term used the broad concept of "used in connection with," similar to the broad interpretation of the contractor records provision adopted by the court of appeals in this case. *Cf. Star-Times,* 337 Wis. 2d 710, ¶¶ 17, 22–23.

¶ 114.  Ultimately, Chapter 335 did not include the broadly defined term "maintains" as drafted for SB 482. In fact, the legislature rejected several attempts to amend Chapter 335 to include the broader "maintains" definition from SB 482. Thus, the DOJ concludes, the legislature knew how to describe contractor records in broad terms, chose not to use broad terms, and this court should not interpret the present contractor records provision in Wis. Stat. § 19.36(3) as broadly as the court of appeals did and as the majority opinion does now.

---

[4] The engrossed version of 1979 Senate Bill 492 defined "maintains" to include data in "the legal custody of a person who performs or has performed services under contract to the authority agency and the data has been collected, stored, disseminated or used in connection with the performance of the services . . . ."

¶ 115. The majority's dismissal of the DOJ's argument is not compelling. I would adopt the DOJ's interpretation of the public records law, recognizing that the DOJ is entitled to great weight deference because of the experience of this agency charged with enforcing the law.

¶ 116. If the DOJ's interpretation were adopted, the legal invoices would not be contractor records under Wis. Stat. § 19.36(3).

## III

¶ 117. Juneau County has not relied on Wis. Stat. § 905.03, the statute on lawyer-client privilege, as a basis for its nondisclosure, in arguing its case in this court. It did, however, assert the privilege in the circuit court and in the court of appeals.

¶ 118. The majority seizes upon the County's strategy in this court as justification for not discussing the lawyer-client privilege in its opinion. Nonetheless, in ordering the County to turn over *unredacted* legal invoices under the public records law, the majority appears to be sending a message that the confidentiality of legal invoices may be in jeopardy under the public records law. If this is correct, it would be very bad news for "authorities" involved in litigation because it would depart from established precedent by treating "authority" parties different from non-authority parties under Wis. Stat. § 905.03.[5]

---

[5] Wisconsin Stat. § 905.03(2) and (3) provide in part:

(2) General Rule of Privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's

¶ 119. Our precedent is that "attorney billing records are protected by the lawyer-client privilege." *Lane v. Sharp Packaging Systems, Inc.,* 2002 WI 28, ¶ 3, 251 Wis. 2d 68, 640 N.W.2d 788. They are confidential if they reveal the nature of legal services provided or the substance of lawyer-client communications. *Id.*

¶ 120. In *Lane,* the court observed that "once the professional relationship is established, all communications, oral and written, between attorney and client are privileged from production excluding those exceptions outlined in the statute." *Id.,* ¶ 21 (quoting *State ex rel. Dudek v. Circuit Court for Milwaukee Cnty.,* 34 Wis. 2d 559, 580, 150 N.W.2d 387 (1967)). However, the court added that the privilege should be contained so that it does not extend beyond its core rationale of ensuring candor and full disclosure between lawyer and client. *Lane,* 251 Wis. 2d 68, ¶ 21.

¶ 121. Hence, legal invoices are not inherently beyond the reach of a public records request, especially when the request is focused on fee arrangements involving the expenditure of tax dollars. But when a request seeks to uncover details about "the nature of legal services provided," *id.,* ¶ 37 (citing *United States*

lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.

(3) Who May Claim the Privilege. The privilege may be claimed by the client, . . . The person who was the lawyer at the time of the communication may claim the privilege but only on behalf of the client. The lawyer's authority to do so is presumed in the absence of evidence to the contrary.

*v. Horn,* 976 F.2d 1314, 1316–17 (9th Cir. 1992), and *Real v. Cont'l Group, Inc.,* 116 F.R.D. 211, 213–14 (N.D. Cal 1986)), or "the substance of lawyer-client communications," *Lane,* 251 Wis. 2d 68, ¶ 39, the request becomes highly sensitive and may require in camera review by a court, as happened here.[6]

¶ 122.  In my view, the County, County Mutual, and Crivello Carlson all had the right to assert the lawyer-client privilege. County Mutual and Crivello Carlson had an obligation to do so.

¶ 123.  The lawyer-client privilege may be claimed by the client (the County). Wis. Stat. § 905.03(3). In this case it was. The client's decision binds others who are bound up in a confidential relationship with the client.

¶ 124.  County Mutual had and has a contractual and fiduciary relationship with the County and is a "representative of the lawyer" as defined in Wis. Stat. § 905.03(1)(c) and listed in Wis. Stat. § 905.03(2). If the latter categorization were not true, the insurer's ability to protect its insured client's confidential communications would become hollow. In support of this categorization, the insurer/"representative of the lawyer" monitors the lawyer's expenditures, pays the lawyer's bills, and plays a role in any settlement.

¶ 125.  The stakes in this dispute are obvious. The Star-Times already has information on the names of the County's lawyers, the number of hours they worked, and the amount they were paid—not by the County with County tax dollars, but by the County's insurer. What the Star-Times wants are "detailed descriptions of

---

[6] The court of appeals acknowledges that "many of the redacted portions are descriptions of legal services rendered." *Juneau Cnty. Star-Times v. Juneau Cnty.,* 2011 WI App 150, ¶ 41, 337 Wis. 2d 710, 807 N.W.2d 655; *see also id.,* ¶ 45.

the nature of the legal services rendered" and "the substance of [the] lawyer-client communications." *See* ¶ 96, *supra.*

¶ 126. Any court that determines that these matters of substance are *not* present in the subject invoices must be prepared to rule that the circuit court's findings were clearly erroneous.

¶ 127. Deciding this case without discussing the lawyer-client privilege in relation to the *limiting* language of the public records law (in Wis. Stat. §§ 19.31, 19.35(1), 19.36(1), and 19.85(1)(g)) casts a dark shadow over the lawyer-client privilege *and other privileges* in Chapter 905.

¶ 128. An appellate court should reduce uncertainty, not magnify it. The likely result of this case will be to force changes in billing practice. In the future, legal invoices related to an "authority" may be sanitized so that they provide insurers and public entity clients with no information except the hours worked and the amount owed as well as an invitation to discuss the details orally.

¶ 129. For the foregoing reasons, I respectfully dissent.

¶ 130. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join this opinion with the caveats expressed in Justice Ziegler's dissenting opinion.

¶ 131. ANNETTE KINGSLAND ZIEGLER, J. (*dissenting*). I join Justice Prosser's dissent and write separately to clarify my position regarding Section III of that dissent as it pertains to my interpretation of the majority opinion and to clarify the extent to which I join that portion of Justice Prosser's dissent. I depart from the portion of the dissent that infers the majority

opinion has concluded that the records must be disclosed regardless of the attorney-client privilege. I dissent from any such inference in the majority opinion.

¶ 132. Juneau County has not relied on Wis. Stat. § 905.03, the statute regarding lawyer-client privilege, in its arguments before this court. The majority recognizes the potential limitation of the opinion's application because the County failed to discuss attorney-client privilege. While the majority opinion makes some broad statements regarding an attorney-client relationship being created between the law firm and the County, it does so noting that the County failed to argue that the attorney-client privilege protects it from disclosure. In short, the majority opinion does not decide whether the attorney-client privilege may bar production of these documents. Thus, the majority opinion could have limited usefulness as it does not address a scenario where attorney-client privilege is at issue.

¶ 133. The County could have argued that the attorney-client privilege bars access to these billing records, and the majority recognizes that this case is decided without consideration of that issue. In fact, the majority states: "Our ruling in the present case does not alter the rules governing confidentiality, attorney-client privilege or lawyers' work product, or any other rules protecting against disclosure. No issue has been raised with regard to these rules. We therefore do not decide which court—the circuit court or the court of appeals —reached the correct result regarding redaction of the invoices." Majority op., ¶ 15. Hence, the majority opinion is limited insofar as it does not address (because it was not argued, briefed, or decided) disclosure of documents where the attorney-client privilege is an issue.

169

¶ 134.  For the foregoing reason I write separately to clarify my position regarding Section III of Justice Prosser's dissent.

¶ 135.  I am authorized to state that Justice MICHAEL J. GABLEMAN joins this dissent.